1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT
9                      FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11   PAULA SPARKMAN, on behalf of            No. 2:24-cv-01206-DJC-DMC
12   herself and all others similarly
     situated,
13
                    Plaintiff,              ORDER
14
15   v.
16   COMERICA BANK, et al.,
17                  Defendants.
18
19        Named Plaintiff and Class Representative Paula Sparkman is a child support

20   recipient.  Like all Class Members, Plaintiff receives her child support through

21   California's Department of Child Support Services.  These child support payments are

22   given to Class Members through a "Way2Go" debit card provided by Defendant

23   Conduent State and Local Solutions, Inc. and issued by Defendant Comerica Bank.

24   Plaintiff and other Class Members were charged a fee in connection with calls they

25   made to the customer support phone line offered by Defendant Conduent in

26   connection with the Way2Go card.  Plaintiff asserts that this fee violated California's

27   Unfair Competition Law ("UCL").

28

The issue before the Court is this: does a fifty-cent fee charged for customer support calls by Way2Go card users who make more than three calls in a month constitute an "unfair" business practice under the UCL?  Plaintiff's claim might seem relatively inconsequential given the almost de minimis nature of the fee.   But this description belies the significance of these charges.  These fees are deducted from payments intended to allow parents to effectively support and raise their children and amount to a substantial cost to child support recipients.  When balanced against the fact that Defendants are already paid to operate the automated phone line and that the existence of the automated phone line actually <u>saves</u> Defendants money, the unfair nature of the business practice becomes apparent.

Presently pending before the Court are Cross-Motions for Summary Judgment filed by each side as well as a handful of related evidentiary motions.  For the reasons stated below, the Court grants Plaintiff's Motion for Summary Judgment and denies Defendant's Motion for Summary Judgment.

## BACKGROUND

While the briefing indicates there are some outstanding factual disputes between the parties, both Plaintiff and Defendants assert that there are no genuine disputes of material fact that would preclude summary judgment.  (Pl.'s Mot. at 4; Defs.' Mot. at 7–8.)  Defendant Conduent has an exclusive contract with California's Department of Child Support Services ("DCSS").  (Joint Statement of Undisputed Facts ("JSUF") (ECF No. 70) ¶ 1.)  This contract makes Defendant Conduent responsible for the disbursement of all DCSS child support payments to recipients.  (*Id.*)  Defendant Conduent provides three options for child support recipients to receive payments: check, direct deposit, or a prepaid Mastercard debit card known as a "Way2Go" card.  (*Id.* ¶ 2.)  These are the only three options for child support recipients to receive their payments, and the Way2Go card is the only debit card option.  Defendant Comerica Bank is responsible for issuing the physical Way2Go cards, managing the relationship with Mastercard, and monitoring Defendant Conduent's legal compliance.  (Plaintiff's

Statement of Undisputed Facts[1] ("PSUF") (ECF No. 92) ¶ 8.)  Defendant Comerica is also responsible for holding child support payments in a deposit account from which Defendant Comerica collects interest that is shared with Defendant Conduent.  (*Id.* ¶ 28.)

Way2Go card users are offered three ways to obtain customer support: an online portal, a mobile app, and a phone line.  (*See* Defendants' Statement of Undisputed Facts ("DSUF") (ECF No. 108) ¶ 32.)  When Way2Go users call the customer support phone line, they are initially placed into an automated system known as an Interactive Voice Response ("IVR") system.  (JSUF ¶ 5.)  Defendant Conduent contracts with a third party, Verint Americas Inc., to provide the IVR services.  (*Id.* ¶ 10.)Under the Terms of Use of the Way2Go card, card users are given three free calls per month, after which they are charged fifty cents for each additional usage of the IVR system in that month.  (*Id.* ¶ 6.)  This fee is automatically deducted from the account and, where the funds in the account are insufficient to cover the fee, unpaid fees are deducted from the next deposit of child support placed in the user's account.  (PSUF ¶ 37.)

Way2Go users may ultimately be routed to a live agent for which they are not charged an additional fee, but users must first go through the IVR system (and pay the fee) to access a live agent.  (*Id.* ¶¶ 12, 19.)  Live agents are able to accomplish certain tasks that cannot be completed using the IVR system.  (*Id.* ¶ 21.)  Usage of the online portal and mobile app does not cost a fee and allows Way2Go card users to complete certain customer service functions.  Notably, however, some functions cannot be completed using the portal or app, and must be done over the phone.  (*Id.* ¶ 14.)

Under Defendant Conduent's current 5-year contract with DCSS to manage the child support disbursement program, Conduent will receive $79,541,043.42.  (*Id.*

---

[1] Unless otherwise noted, such citations are to facts which the parties agree are undisputed.

¶ 25.)[2]  The contract requires that Defendant Conduent provide a prepaid debit card program for child support payments and offer a customer service line with both live operators and a 24/7 IVR system.  (*Id.* ¶ 10.)  Between July 2020 and December 2024, Defendant Conduent charged Way2Go card users at least $7,619,059.00 in IVR fees. (JSUF ¶ 9.)

The Court previously granted Plaintiff's Motion to Certify Class.  (ECF No. 52.) Plaintiff and Defendants now both seek summary judgment in their favor.  Briefing on the Cross-Motions is complete.  (Pl.'s Mot. (ECF No. 69); Defs.' Mot. (ECF No. 93); Pl.'s Reply (ECF No. 107); Defs.' Reply (ECF No. 116).)  Filed in connection with the Cross-Motions are Plaintiff's Motion to Strike the Expert Report of Carl Pry (ECF No. 66), Defendants' Motion to Exclude the Expert Testimony of Jonathan Jaffe (ECF No. 88), and Plaintiff's Motion to Exclude Late Disclosed Information (ECF No. 118).

## EVIDENTIARY MOTIONS

### I.  Motion to Exclude the Expert Report of Carl Pry

Plaintiff contends that the Rebuttal Report of Carl Pry should be excluded because it is not properly a rebuttal report, contains impermissible legal conclusions, and partially analyzes irrelevant information.  The Pry Report was a rebuttal to the report of the Expert Report of James B. Shanahan and purports to address the reasonableness of the IVR fee.  It does appear that the Pry Report was intended both as an expert report and as a rebuttal.  In the introduction to the report, Pry notes what he was asked to provide opinions on and then notes that "[a]dditionally, I was asked to review and provide a rebuttal of the report of the Plaintiff's expert, James B. Shanahan."  (Pry Report (ECF No. 67-1) at 1.)  This strongly implies that the Pry Report was only partially addressing and rebutting the contents of the Shanahan Report.  This is largely borne out in reading the Shanahan and Pry Reports.  Parts of the Pry Report do serve as a rebuttal to the Shanahan Report, but others address the topics that seem

---

[2] Defendants do not dispute that the contract with DCSS is for that amount, but do contend that this amount is not payment for managing the Way2Go program.  These arguments are addressed below.

1    well beyond the subject matter of the Shanahan Report.  Thus, at least some portions

2    of the Pry Report may be untimely.  *See* Fed. R. Civ. P. 26(a)(2)(D)(ii).

3         That said, the Court need not reach this issue.  Even when the rebuttal report of

4    Carl Pry is considered in full, the outcome assessed below is not altered.  The Court

5    thus denies this motion as moot.

6    **II.  Motion to Exclude the Expert Testimony of Jonathan Jaffe**

7         Defendants request that the Court preclude Plaintiff from introducing the

8    testimony and reports of Jonathan A. Jaffe on the basis that Jaffe's expert analysis is

9    deficient and unreliable.  (*See* ECF No. 88 at 6–12.)  Defendants also contend that

10   Jaffe's Second Supplemental Report was untimely as it was not served until after the

11   close of expert discovery.  (*See id.* at 12–15.)

12        Defendants' arguments as to the sufficiency of the opinions in Jaffe's initial

13   report and first supplemental report appear to encompass three issues.  First,

14   Defendants take issue with Jaffe's calculation of various "figures" such as the average

15   call duration, median call duration, and number of unique calls.  (*Id.* at 6–7.)

16   Defendants argue that this information is not relevant.  Perhaps to Defendants' point,

17   the Court need not consider whether this expert testimony is proper, as these findings

18   are ultimately not relevant to the Court's analysis below.  Thus, they are not

19   considered.  Second, Defendants contend that Jaffe's calculation of the costs

20   estimated in running the IVR line is improper.  (*Id.* at 9–10.)  As the Court does not

21   consider this evidence below, the Court need not determine whether this opinion was

22   proper.  Finally, Defendants contest Jaffe's calculation of the amount of IVR fees

23   charged to Class Members.  Defendants and Plaintiff are in agreement that Jaffe's

24   original calculations incorrectly included data from the entirety of July instead of from

25   the Way2Go program's start on July 20, 2020.[3]  (ECF No. 88 at 14–15; ECF No. 105 at

26   1.)  Given the lack of dispute over whether this calculation was correct, the Court does

27   _____

28   [3] The Way2Go program began on July 20, 2020, but was preceded by another program.

5

1  not consider these calculations.  Given the above, Defendants' Motion as to the above

2  issues is denied as moot.

3      After recognizing that Jaffe had included an additional 19 days in his

4  calculations, Plaintiff had Jaffe create a Second Supplemental Report, which corrects

5  this error.  As Defendants point out, this report was untimely disclosed.  As such, it

6  must be excluded unless the late disclosure was substantially justified or is harmless.

7  *See* Fed. R. Civ. P. 37(c)(1).  Plaintiff argues both that there was a substantial

8  justification and that the late disclosure was harmless.  As Jaffe was correcting the

9  calculations to align with the start date for the Way2Go program, the Court is

10 convinced that the late disclosure was harmless.  The IVR fee calculation in the Second

11 Supplemental Report was curing an error identified by Defendants in that calculation.

12 The Second Supplemental Report also added additional dates from July 1, 2024 to

13 February 21, 2025 that were not included in prior reports.  But this also appears

14 harmless.  The data used to calculate these amounts was not provided until April

15 2025, and the calculation methodology is identical to what was used during the other

16 periods.  In effect, the Second Supplemental Report was merely correcting an

17 arithmetic error that Defendants themselves had identified.  Accordingly, Defendants'

18 Motion is denied as to the calculation of IVR fees within Jaffe's Second Supplemental

19 Report.

20 **III. Motion to Exclude Late-Disclosed Discovery or Reopen Discovery**

21     After the close of the briefing of the parties' Cross-Motions for Summary

22 Judgment, Plaintiff moved to exclude certain responses to interrogatories and

23 requests for production as information provided after the discovery cutoff.  (ECF No.

24 118.)  In particular, the responses at issue are related to Conduent's profits and costs

25 related to the IVR line.  From the information available to the Court, it appears that the

26 parties were willingly and mutually engaged in discovery efforts after the discovery

27 cutoff of December 27, 2024.  On February 28, 2025, Conduent apparently amended

28 its responses to Plaintiff's interrogatories to provide information about Conduent's

1    income and profits from the IVR surcharges in "narrative form."  In April, Plaintiff

2    moved to compel production of certain related financial reports that were disclosed

3    during a March deposition, with Conduent's Rule 30(b)(6) witness, but that motion was

4    denied by the Magistrate Judge as it was made after the close of discovery.  (ECF No.

5    118 at 4.)

6         It does not appear that there are grounds to exclude the challenge information

7    or reopen discovery.  While the disclosure may not have been timely, it appears that

8    discovery efforts were mutually occurring beyond the discovery deadline.  It also

9    seems likely that this late disclosure was harmless given that relevant depositions had

10    not yet taken place.  Plaintiff claims it was not harmless, based in large part on the fact

11    that Plaintiff was unable to get discovery regarding the expenses Defendants assert.

12    This is a related but separate issue.  It was not until after the later disclosure at the

13    deposition that Plaintiff realized these financial reports existed and moved to compel

14    their production.  Moreover, while the Magistrate Judge denied Plaintiff's request to

15    compel the financial reports, that denial was based solely on the fact that discovery

16    was closed.  Despite ample time to do so, Plaintiff made no effort to request that

17    discovery be reopened.

18         The Court does note that the evidentiary value of narrative responses at issue

19    seems limited.  Most notably, the assertions provided in response to Plaintiff's request

20    for production and interrogatories concerning the pre-tax revenue, expenses, and

21    profits related to the IVR line – including the table that summarizes Defendants'

22    asserted costs which is a central point of contention – are made without any

23    evidentiary support.  Defendants have essentially provided only unsupported claims

24    as to the costs of running the IVR line.  For this reason and the reasons described

25    below, the Court considers these responses but affords them little weight.

26

27

28

7

1    **CROSS-MOTIONS FOR SUMMARY JUDGMENT**

2    **I.  Legal Standard**

3         Summary judgment may be granted when the evidence shows that there is no

4    genuine issue as to any material fact and the moving party is entitled to a judgment as

5    a matter of law. Fed. R. Civ. P. 56(a).  The principal purpose of summary judgment is to

6    dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477

7    U.S. 317, 325 (1986).  Therefore, the "threshold inquiry" is whether there are any

8    factual issues that could reasonably be resolved in favor of either party, or conversely,

9    whether the facts are so one-sided that one party must prevail as a matter of law.

10   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986).

11        In a summary judgment motion, the moving party must inform the court of the

12   basis for the motion and identify the portion of the record that it believes

13   demonstrates the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at

14   323.  If the moving party meets its initial burden, the burden then shifts to the

15   opposing party, which must establish that there is a genuine issue of material fact.

16   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  For the

17   opposing party to succeed and avoid summary judgment, they "must do more than

18   simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 586.

19   Rather, the opposing party must produce enough evidence such that the specific facts

20   set forth by the nonmoving party, coupled with undisputed background or facts, are

21   such that a reasonable factfinder might return a verdict in their favor.  *T.W. Elec. Serv.,*

22   *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words,

23   for the moving party to succeed, the court must conclude that no rational trier of fact

24   could find for the opposing party.  *Matsushita*, 475 U.S. at 587.  The Court draws all

25   reasonable inferences and views all evidence in the light most favorable to the

26   opposing party.  *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587–88.

27

28

## II. Discussion

### A. UCL Standing

As an initial matter, Defendants contend that Plaintiff lacks standing to bring claims under the UCL. As amended, the UCL requires that a plaintiff establish that she has "suffered injury in fact and has lost money or property as a result of the unfair competition." Bus. & Prof. Code § 17204. To meet this requirement, a plaintiff must show that she sustained economic injury (injury-in-fact) and causation connecting that injury to the unfair business practice. *Kwikset Corp. v. Superior Ct. of Orange Cnty.*, 51 Cal. 4th 310, 322 (2011). The California Supreme Court has stated that there are "innumerable ways" that the economic injury requirement can be satisfied and identified a non-exhaustive list of possible ways to show economic injury:

> A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary.

*Id.* at 323.

Plaintiff has standing to bring claims under the UCL. In June 2023, Plaintiff made five calls to the IVR line and was charged $1.00 in IVR fees. (DSUF ¶ 35.) Two of these calls were disconnected when Plaintiff selected the "wrong" option from the IVR phone service menu. (*Id.* ¶ 39.) Plaintiff alleges injury in the form of the IVR fee that she was required to pay in connection with her calls to the customer service line. Plaintiff claims that charging these IVR fees was an unfair business practice and that, because of that practice, Plaintiff had to pay the fees and was thus deprived of those funds. This is sufficient to establish injury for purposes of standing. *See Walters v. Target Corp.*, No. 3:16-cv-01678-L-MDD, 2017 WL 3721433, at *5 (S.D. Cal. Feb. 14, 2017) (finding standing based on fees incurred for using a debit card); *Gilliam v. Bank of Am.*, No. 17-cv-01296-DOC-JPRx, 2018 WL 6537160, at *28 (C.D. Cal. June 22,

1    2018) (finding standing in part based on "increased costs and fees" paid based on the

2    defendants' practices).

3        Defendants argue that Plaintiff cannot assert standing because she cannot show

4    that "she was forced to act in a certain way based on Defendants' alleged unfair

5    conduct" and was not "compelled to incur" any charges. (Defs.' Mot. at 19–20.) But

6    Defendants quote only the fourth item in the list identified above, in which the *Kwikset*

7    court provided several ways a plaintiff can establish injury-in-fact. (*See* Defs.' Mot. at

8    19 (citing *Kwikset*, 51 Cal. 4th at 323).) As identified, Plaintiff has shown economic

9    injury under the third option in that list: that Plaintiff was deprived of money or

10   property to which she has a cognizable claim. This is sufficient to establish standing

11   without a showing that Plaintiff was forced or compelled to act.

12       Defendants also assert that Plaintiff cannot have standing "where a business has

13   acted in accordance with its contractual obligations, such as properly assessing a fee

14   clearly disclosed in the contract." (Mot. at 19.) In effect, Defendants argue that

15   Plaintiff cannot have standing because Plaintiff's claim concerns the assessment of a

16   fee that was disclosed in the contractual terms for using the Way2Go card. But

17   Defendants' citations for this proposition are unconvincing as they involve

18   substantially different facts that render them easily distinguishable or address different

19   legal issues. Plaintiff mainly relies on *Fabozzi v. Stubhub, Inc.*, No. 11-cv-01385-EMC,

20   2012 WL 506330 (N.D. Cal. Feb. 15, 2012) and *Bower v. AT&T*, 196 Cal. App. 4th 1545

21   (2011). In *Fabozzi*, the court considered whether individuals who willingly used the

22   Stubhub platform to purchase tickets had stated a claim under the unfair prong of the

23   UCL. 2012 WL 506330, at *7–8. While the court ultimately determined the plaintiff

24   had not stated a claim under the unfair prong, the court did not consider or address

25   whether the plaintiff had standing for purposes of the UCL.[4] *Id.*

26

27   _____

     [4] The court did find that the plaintiff had "probably failed to plausibly allege injury as a result of
28   Defendant's allegedly unfair conduct." *Fabozzi*, 2012 WL 506330, at *8. But this statement was made
     in the context of the application of the balancing test discussed further below. While the injury-in-fact

1    In *Bower*, the court did find that the plaintiff lacked standing under the UCL.

2  196 Cal. App. 4th at 1553–55.  The plaintiff in *Bower* alleged that it violated the UCL

3  for AT&T to misrepresent that it was required to charge her sales tax on the

4  "unbundled sales price" of her cellphone.  *Id.* at 1548.  As the court noted, the

5  plaintiff's UCL claims rested on two key allegations: (1) that the plaintiff was told by an

6  AT&T representative that AT&T was required by law to charge the plaintiff the tax and,

7  (2) that she relied on that misrepresentation and thus was denied an opportunity to

8  "shop around" for retailers who did not charge purchasers sales tax.  *Id.* at 1554.  The

9  court found that these allegations were insufficient to establish injury-in-fact because

10  the plaintiff "did not allege that she could have obtained a bundled transaction for a

11  new cellular telephone–the telephone that she selected–at a lower price from another

12  source." *Id.* at 1555.  Essentially, in *Bower*, the plaintiff lacked standing because the

13  plaintiff had alleged an injury based on her inability to shop around for a retailer that

14  did not charge her sales tax, but had not shown that such a retailer existed.

15    Beyond the fact that both concern what could be loosely categorized as a fee,

16  the claim in *Bower* has little in common with Plaintiff's claim in this action.  Plaintiff

17  does not contend that she could have shopped around for other providers absent

18  some misrepresentation from Defendants.  In fact, Plaintiff's contention here is that

19  due to Defendant Conduent's exclusive contract with DCSS, Conduent was the sole

20  distributor of child support payments available to child support recipients, and the

21  Way2Go card was the <u>only</u> debit card option available for Plaintiff and Class Members.

22  This meant that Plaintiff had no option but to accept the Terms of Use of the Way2Go

23  card, including the IVR fee that was part of those terms.  Significantly, the UCL cause of

24  action in *Bower* appears to have been based on a theory of misrepresentation.  To

25  have standing under that theory, the Plaintiff in *Bower* was required to show either that

26  she could have purchased the phone at a lower cost, or that she would not have

27
───────────────────────────────
requirement for standing and the balancing test may overlap, they are still separate issues, and the
28  court in *Fabozzi* did not find that the plaintiffs lacked standing.

1    purchased the product but for the misrepresentation, and it was worth less or was

2    different than what the consumer expected. *Id*. at 1555. The court's holding in *Bower*

3    is grounded in the specific allegations at issue in that case; it is of little relevance given

4    the distinct factual basis of the claims here, which do not (and need not) rely on any

5    misrepresentation.

6        Defendants also cite *Tripp v. PHH Mortg.*, No. 5:15-cv-01364-AB-DTB, 2015 WL

7    12645023 (C.D. Cal. Aug. 20, 2015), largely for its statement that "performance of a

8    preexisting contractual obligation of making loan payments does not constitute

9    'damage' to the borrower." *Id*. at *3 (internal citation omitted). The plaintiff in *Tripp*

10    argued that the defendant's denial of a third mortgage modification constituted an

11    unfair business practice. *Id*. at *1. The plaintiff did not assert that the prior loan

12    modification or the payments the plaintiff had to make because of it were unfair.

13    While the quoted language could be read more broadly, the court's statement in

14    *Tripp* was that the plaintiff could not assert that the payment of her mortgage

15    constituted an injury from the denial of a loan modification because she had agreed to

16    make those payments in connection with a prior loan modification. This is an

17    obviously distinct claim from the one presently before the Court, as here Plaintiff is

18    claiming the IVR fee itself is an unfair business practice.[5] Accordingly, the Court

19    concludes Plaintiff has standing to assert her UCL claims.

20       **B. UCL Claim**

21        The majority of Plaintiff and Defendants' Cross-Motions can be summarized as a

22    disagreement as to what, as a matter of law, constitutes an "unfair" business practice

23    under the UCL. This is not to imply that this is an easy question to answer. Cases

24    where California and Federal courts are called upon to clarify what falls within the

25    scope and function of the UCL and its unfair prong are legion.

26

---

[5] Defendants' standing arguments substantially overlap with their more general arguments regarding

27    the sufficiency of Plaintiff's claims. Specifically, Defendants' standing and merits arguments focus on
the idea that Plaintiff cannot assert claims based on contract terms to which she knowingly agreed. The

28    Court addresses them below in assessing the merits of Plaintiff's claim.

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200, *et seq.*  There are three "prongs" through which a plaintiff may assert a violation of the UCL: unlawful, unfair, and fraudulent.  Plaintiff's claim here is brought under the "unfair" prong of the UCL.  "The unfair prong of the UCL 'creates a cause of action for a business practice that is unfair even if not proscribed by some other law.'" *Day v. GEICO Cas. Co.*, 580 F. Supp. 3d 830, 844 (N.D. Cal. 2022) (quoting *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1023 (N.D. Cal. 2019)).  Whether conduct is unfair can be determined in two ways: (1) by establishing that the conduct offends "some legislatively declared policy" (the "tethering" test) or (2) by weighing the utility of the conduct against the harm to the alleged victim (the "balancing" test).  *Id.* at 844–45 (citing *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007) and *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012)).

There has been substantial confusion among the courts about when and where each test is appropriate.  In some cases, such as those involving competitor suits, the California Supreme Court has provided a clear answer.  *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999).  But whether consumer suits should be analyzed under the balancing or tethering test remains unresolved.  *See Nationwide Biweekly Admin., Inc. v. Superior Ct. of Alameda Cnty.*, 9 Cal. 5th 279, 304 (2020) (acknowledging split in California appellate courts but declining to address whether the tethering test also applies to consumer suits).  Without any such guidance, the Ninth Circuit has endorsed the use of the balancing test for consumer suits, but has in practice reviewed unfairness under both the balancing and tethering tests.  *See Lozano*, 504 F.3d at 735 (stating that the two tests are not mutually exclusive); *Davis*, 691 F.3d at 1170 (finding the plaintiff failed to state a claim under either the balancing or tethering test); *see also Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1215 (9th Cir. 2020).

**1. Challenges to Contract Terms Under the UCL**

Before discussing the application of these tests, the Court first addresses Defendants' central argument that Plaintiff cannot assert a claim based on the IVR fee as it is an improper attempt to review the fairness of that contract and rewrite its terms. In support of this argument, Defendants point out that the IVR fee was disclosed in the Terms of Use for the Way2Go card which Plaintiff accepted by choosing to receive child support funds via the Way2Go card.

Several federal and California courts have repeated the statement that the UCL "does not give the courts a general license to review the fairness of contracts." *See, e.g.*, *Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036, 1046 (C.D. Cal. 2008) *aff'd sub nom. Spiegler v. Home Depot USA, Inc.*, 349 F. App'x 174 (9th Cir. 2009); *see also Searle v. Wyndham Int'l, Inc.*, 102 Cal. App. 4th 1327, 1334 (2002). This refrain can generally be traced back to California's First District Court of Appeal's 1993 decision in *Samura v. Kaiser Found. Health Plan*, 17 Cal. App. 4th 1284 (1993). In *Samura*, the court addressed whether the third-party liability provision in Defendants' member service agreements constituted unfair competition. In footnote 6 of that order, the court noted the following:

> Though the issue has never been adjudicated, a practice of enforcing the third party liability provisions with disregard for considerations of unconscionability might constitute an unfair business practice in violation of the unfairness term of Business and Professions Code section 17200. But the record here contains no finding of such a practice. We see no other issue relating to the unfairness term of Business and Professions Code section 17200 deserving of extended discussion. The term does not give the courts a general license to review the fairness of contracts but rather has been used to enjoin deceptive or sharp practices.

*Id.* at 1299 n.6 (citations omitted). It is the end part of this footnote – that the UCL does not give the courts a general license to review the fairness of contracts – that is often cited by other courts.

As a general principle, this rule is undoubtedly reasonable.  Permitting courts to engage in a general review of the fairness of contracts under the UCL would necessarily mean that the UCL alters core contract law.  This is not the intent or function of the UCL.  Moreover, it would defy logic for an individual to challenge as unfair terms they had voluntarily agreed to as part of an arm's length transaction.  Yet, while oft-stated, the rule that courts do not have a general license to review the fairness of contracts is still only a general rule and, as such, may not be applicable in every situation.  The Court declines to read into this footnote a *per se* bar to bringing a UCL claim related to any contractual term.  Indeed, the *Samura* court itself noted that "a practice of enforcing the third party liability provisions with disregard for considerations of unconscionability" might constitute an unfair practice in violation of the UCL despite the fact that such terms are necessarily contained within a contract. *Id.*

The unique facts of this case illustrate the problem with a *per se* rule.  The Terms of Use that accompany the Way2Go card hardly resemble a contract in the traditional sense.  At a bare minimum, it represents a contract of adhesion and a particularly oppressive contract of adhesion at that.  "A contract of adhesion is defined as 'a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms.'"  *Id.* (quoting *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001)).  Put another way, "[a]n adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power on a take-it-or-leave-it basis."  *Ly v. Tesla, Inc.*, 757 F. Supp. 3d 1033, 1042 (N.D. Cal. 2024) (*quoting OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 126 (2019)).

It is inarguable that the Terms of Use that accompany the Way2Go card are a contract of adhesion.  Conduent has an exclusive contract with DCSS to distribute child support payments.  As the holder of an exclusive contract with DCSS, Conduent's bargaining power is superior to that of the child support recipients to the greatest degree possible.  As this is a single-provider market, Class Members have no

1    option but to deal with Conduent if they wish to receive child support payments.

2    Moreover, the Way2Go card is the only option for Plaintiff and Class Members to

3    receive their child support payments via a debit card, which the Court notes is a

4    common and convenient way that government entities provide funds to individuals.

5    Thus, the contract is take-it-or-leave-it in the traditional sense that in order to get the

6    Way2Go card, Class Members must agree to the terms as is.  But it is also take-it-or-

7    leave-it in the more extreme sense that Class Members must agree to the terms to

8    have <u>any</u> ability to receive funds in a manner other than check or direct deposit to a

9    checking account.

10         Under the unique facts of this case, the Court concludes that application of the

11    general rule that the UCL does not give courts license to review the fairness of

12    contracts is inappropriate.  The nature of the Terms of Use and the conditions in which

13    they were imposed render this case fundamentally distinct from other cases that have

14    invoked this rule.  The parties have not cited, and the Court cannot find, any case

15    applying this rule with a contract imposed in remotely comparable conditions.

16    Instead, the courts in these cases are addressing claims of unfairness connected to

17    contracts that were freely negotiated and agreed to by the parties.

18         For example, in *Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036 (C.D.

19    Cal. 2008), *aff'd,* 349 F. App'x 174 (9th Cir. 2009), the district court cited the *Samura*

20    footnote in connection with the plaintiff's claim that the price to reface cabinets should

21    be based on a calculation different from what was contained in the parties' contract.

22    *Id*. at 1046.  Relying on *Samura*, the Court rejected plaintiff's argument that this

23    constituted an unfair business practice, stating that the UCL could not be used to

24    simply rewrite the parties' contract as that was "not the deal that plaintiffs struck[.]"

25    Similarly, in *Kumar v. Ally Fin. Inc.*, No. 2:22-cv-05184-SVW-MRW, 2022 WL 16962283

26    (C.D. Cal. Oct. 17, 2022), the court found that the plaintiff had not stated a UCL claim

27    based on the allocation of excess insurance proceeds to a financer where the vehicle

28    lease agreement explicitly allocated excess insurance proceeds in that fashion.  Citing

1  another district court which quoted *Samura*, the court in *Kumar* stated that the parties

2  were "permitted to enter into a contract allocating the excess insurance proceeds" in

3  that fashion. *Id.* at *5.

4      In the factual context of these cases, and indeed most cases where there is a

5  contract, it is logical to invoke the rule that the UCL is not intended to give courts a

6  general license to review contracts. The contracts in *Spiegler*, *Kumar*, and similar

7  cases were freely negotiated within the open market. In this context, the UCL should

8  not be leveraged to invade the realm of contract law and invalidate the provisions of

9  the deal that the parties in these cases struck. But that is not the situation found in this

10  case and invocation of the rule here is not reasonable.

11      Class Members were presented with a limited set of three options to receive

12  child support payments: a direct deposit, a check, or a debit card. Due to Conduent's

13  exclusive contract with California, Class Members had no ability to pursue other

14  providers, seek other options, or negotiate terms. Conduent was the only option for

15  Class Members to receive payments, and the Way2Go card (along with its attendant

16  Terms of Use) was the only debit card option provided. Additionally, due to the vital

17  nature of the child support payments in question, Class Members had no option but

18  to engage with this system and Conduent's services. In short, Class Members needed

19  these payments to support and provide for their children, Conduent was the only

20  business from which Class Members could receive these funds, and the Way2Go card

21  was the only way they could receive those funds through a debit card. This is a

22  distinct set of facts that renders null all presumptions about the ability of the parties to

23  freely agree to contract terms. In this unique factual context, the Court finds that

24  Plaintiff is not barred from claiming that the terms Conduent unilaterally imposed on

25  Class Members under the Terms of Use were unfair in violation of the UCL.

26      **2. Balancing Test**

27      Having concluded a claim under the UCL is potentially viable here, the Court

28  turns to assess whether the IVR fee is unfair. Under the balancing test, the Court must

1  consider the alleged unfair practice and consider "[its] impact on its alleged victim,

2  balanced against the reasons, justifications and motives of the alleged wrongdoer.  In

3  brief, the court must weigh the utility of the defendant's conduct against the gravity of

4  the harm to the alleged victim . . . ." *S. Bay Chevrolet v. Gen. Motors Acceptance*

5  *Corp.*, 72 Cal. App. 4th 861, 886–87 (1999) (internal citations and quotations omitted).

6  In assessing whether and to what extent a business practice is harmful, courts will look

7  to whether it is "immoral, unethical, oppressive, unscrupulous or substantially injurious

8  to consumers." *Davis*, 691 F.3d at 1169 (quoting *S. Bay*, 72 Cal. App. 4th at 887).

9       Applying the balancing test, the Court concludes the IVR fee constitutes an

10  unfair business practice.  The evidence shows that the practice of charging the IVR fee

11  is used by Conduent to take meaningful value from the child support payments of

12  Class Members.  This is done through an adhesion contract imposed in notably

13  oppressive circumstances.  The fee is also imposed on Class Members who have little

14  choice but to accept the terms foisted upon them.  Due to DCSS's contract with

15  Conduent, this is a single-provider market.  If Class Members want to receive their

16  child support payments, they must deal with Conduent.  If they wish to receive their

17  funds as a prepaid debit card, they must accept the terms Conduent mandates.  There

18  is no opportunity for Class Members to negotiate or pursue other options.  If they

19  want to receive funds in any form besides a check or direct deposit into a bank

20  account, their only option is to accept Conduent's terms, including the IVR fee.

21       It is easy to shrug off the IVR fee as a minor charge of only fifty cents after three

22  free calls each month.  But the undisputed evidence is that Conduent has charged

23  nearly eight million dollars in IVR fees from only 175,394 Class Members between July

24  20, 2020, and February 21, 2025.[6]  (JSUF ¶ 9; PSUF ¶ 22; DSUF ¶ 23.)  Over this

25  roughly five-year period, the average IVR fee incurred by a Way2Go card user was

26  
27  

---

[6] The exact amount collected is the subject of some disagreement, as Defendants only provide statements of the amounts that they charged but did not collect during a portion of the class period that the parties agreed to.  (*See* JSUF ¶ 9.)  The Court addresses the appropriate determination of the amount collected below.  *See infra* Cross-Motions for Summary Judgment, III.

28

1   over $40.  These fees are taken directly from funds intended to provide necessary

2   assistance and support to children and charged to users seeking customer support,

3   raising serious questions about the fairness of this practice.

4            These charges are also in addition to the 79 million dollars Conduent receives

5   from its contract with DCSS.[7]  (PSUF ¶ 25.)  Defendants dispute this fact and argue that

6   Conduent's contract with DCSS is "to provide services to the State's Support

7   Disbursement Unit[,]" and that these services are "completely separate from the

8   Way2Go card."  (Defs.' Mot. at 5.)  Defendants' distinction lacks merit, and this is not a

9   genuine dispute of fact.  Rather, it is undisputed that Defendant Conduent's contract

10  requires that it provide a program to distribute payments by prepaid debit card and

11  offer a customer service line with live operators and an IVR line.[8]  (PSUF ¶ 10; DCSS

12  Contract (ECF No. 95-2), Ex. A-1 §§ 3.3.1, 3.3.33.)  The contract's provisions are

13  specific, imposing detailed requirements on the debit card to be provided to child

14  support recipients.  For example, the central provision of the DCSS contract

15  concerning the debit card program requires all of the following:

16           [Conduent] shall provide an EPC Program. The EPC card
17           shall;
             1) Be a branded MasterCard or Visa Card or other major
18           credit card that conducts business internationally
             2) Operate via the MasterCard or Visa card network or other
19           major credit card network that conducts business
             internationally
20           3) Be accepted by any participating merchant and shall
21           allow for PIN-based and signature-based purchases
             4) Allow for nationwide/international ATM access and the
22           withdrawal of cash through a normal A TM transaction
             5) Allow for nationwide/international physical bank access
23           for in-person cash withdrawals

24  _____

25  [7] The period of information about the IVR fees Conduent charged and the period of Conduent's current
    contract with DCSS are not identical.  The former covers 2020 through a portion of 2025, while the
26  latter is a five-year contract that expires in 2026.  (DSUF ¶ 23; PSUF ¶ 25.)  These periods do
    substantially overlap.

27  [8] Defendant notes in their Motion that "EPC" within the DCSS contract is the former name of the
28  Way2Go card program.  (Defs.' Mot. at 6.)

6) Be accessible to customers via current MasterCard or Visa or other major credit card network technology which is active and available within the state, globally
7) Operate as a debit card
8) Adjust for changes in global banking requirements
9) Be chipped using the Europay MasterCard and Visa (EMV) standard
10) The EPC program shall be available to participants with or without an SSN
11) Allow telephonic banking transactions

(DCSS Contract, Ex. A-1 § 3.3.1.)  The contract also has numerous related provisions concerning detailed aspects of Conduent's implementation of the Way2Go card solution, even including the name and graphics to be used on the card.  (*See id.* §§ 3.3.2–56.)  The Way2Go card and the IVR line at issue here are how Conduent satisfies these requirements.

Despite these undisputed facts, Defendants loudly assert that Conduent "receives no compensation" from DCSS for the Way2Go service and that the compensation they receive from the DCSS contract is solely for services Conduent provides to California's State Disbursement Unit.  (Mot. at 5.)  This is a meaningless distinction.  Under the contract, Conduent is mandated to provide a debit card program, and there are numerous requirements placed on that program.  In return for this (and other services), Conduent receives payment from DCSS.  The Way2Go card and Conduent's compensation under the DCSS contract are thus intrinsically tied.  Defendants argue that the compensation under the contract is "solely for [Conduent's] work for the SDU" (*Id.* at 5–6), while failing to recognize that providing the Way2Go card is part of that work.

Defendants also note that Conduent bears the costs of implementing the debit card solution and must do so at its own expense.  (*Id.* at 6.)  In support of this argument, Defendants cite to testimony from Joelle Parra, an employee for DCSS who oversees the contract between DCSS and Conduent.  Defendants quote Parra as stating that Conduent is "required to run the EPC solution at its own expense," that

1  "Conduent is not compensated for the cost that it incurs to run the EPC card solution,"

2  and that Conduent had not issued invoices requesting compensation for operation of

3  the Way2Go card. (*Id.* (quoting Parra Dep. at 89:1-93:4.) While it may be that the

4  contract does not permit Conduent to bill specifically for the Way2Go service (which is

5  likely a true statement for much of the overhead required to comply with the

6  contractual terms), that does not mean that part of the overall payment under the

7  Contract is not intended to compensate for running the Way2Go service. Contrary to

8  Defendants' suggestion, this is even further evidence that the compensation in the

9  contract is partially payment for implementing the debit card program, with the

10  expectation that Conduent will at least partially use that compensation to cover those

11  expenses.

12      In addition to the money earned through the contract with DCSS, Conduent

13  also splits with Comerica the interest earned from the child support funds Comerica

14  holds. (PSUF ¶ 28.) Class Members do not receive any interest on funds held in their

15  Way2Go accounts.

16      On the other side, it is certainly true that there is some theoretical utility in

17  charging this fee. Providing customer support services can be an expensive

18  proposition. Defendants contend that the fee charged is intended to "help[] offset

19  Conduent's expenses incurred for operating the IVR line." (Defs.' Mot. at 29.) But on

20  closer examination, this argument holds little water.

21      The IVR system is an automated service which, by admission of Samuel Hansen,

22  Conduent's Director of Delivery, is a substantial <u>cost-saving</u> service for Conduent.

23  (Hansen Decl. at 76:1-7.) Per Hansen, if they did not have the IVR line, Conduent

24  would "probably need 10 to 20x the employees[,]" and Conduent would not have bid

25  on the DCSS contract at all. (*Id.* at 71:19-20, 76:1-7.) Despite this fact, Class Members

26  are charged based on their usage of the IVR line, not their usage of live customer

27  support. Certain vital customer service functions, such as obtaining replacement

28

1   cards and disputing transactions, can only be accomplished with a live agent, which

2   requires going through the IVR line.  (PSUF ¶ 14.)

3          Defendants also claim that the IVR fee is used to "offset" Conduent's costs in

4   operating the IVR line.  But this claim rests entirely on a chart Defendants produced in

5   response to some of Plaintiff's interrogatories and requests for production.  As

6   discussed above, the Court has not excluded this information, but the lack of

7   evidentiary support substantially reduces its evidentiary weight.  Further reducing the

8   weight of this information is the fact that many of these costs are, at best, tenuously

9   connected to the cost of running the IVR line.  In addition to the amount Conduent

10  pays to Verint to run the line, Conduent asserts additional costs from "[r]eal estate

11  costs, legal, global procurement, just all of [Conduent's] corporate functions that are

12  supporting all of these expenses."  (Hansen Decl. at 39:8–10.)  Conduent even

13  includes the broad cost of conducting fraud investigations in connection with Way2Go

14  card usage as an expense for running the IVR line.  (*Id.* at 77:3–12.)  The cost of

15  conducting fraud investigations has no discernible connection to the IVR system

16  except that users can use the phone line to report fraud.  (*Id.* at 77:3–12.)  When asked

17  about how these expenses were determined, Hansen testified that, "I was given a

18  percentage from corporate that said what -- how to burden the expenses when we

19  rolled this up."  (*Id.* at 81:19–21.)  While Hansen testified about how that percentage

20  was calculated, no further evidence or information was provided about this

21  calculation; Hansen stated that "[t]his is just what they handed to me as what needs to

22  be burdened by the P&L."  (*Id.* at 82:9–11.)

23         These unsupported assertions of Conduent's costs associated with the IVR line

24  are insufficient to justify charging this fee that tips the balance towards fairness.

25  Defendants appear to have pulled together every possible cost that could be even

26  loosely attributed to the California Way2Go program in order to manufacture a reason

27  for charging this fee.  They have also provided no evidentiary support for these claims

28  beyond bare statements.

1    The Court has no doubt that there are costs associated with running the IVR

2    line, but Defendants have vastly overstated them.  Additionally, providing customer

3    support to the Way2Go card users is not only a basic function, but one that is required

4    by Conduent's contract with DCSS, for which they receive substantial compensation.

5    And in any event, this argument is undercut by the fact that Conduent saves money by

6    providing customers with an IVR line as opposed to a live agent, for which Conduent

7    does not charge a fee.

8    In sum, even accepting the utility charging the fee might provide, this does not

9    outweigh the harm inflicted on the Class Members.  A fee taken from child support

10   funds based on a contract term that Class Members had no opportunity to negotiate is

11   oppressive, unscrupulous, and injurious to consumers, such that it overwhelms any

12   utility and is a harmful business practice.  Applying the balancing test, the Court

13   concludes that the IVR fee constitutes an unfair business practice under the UCL.

14   Defendants argue that the IVR fee cannot be considered unfair because

15   "liability under the UCL requires deceit."  (Defs.' Mot. at 25.)  The unfair prong of the

16   UCL contains no such requirement.  Certainly, deceptive conduct may constitute

17   unfair business practices, but that does not mean that unfair business practices are

18   exclusively those that involve deceit.  Defendants correctly note that an unfair business

19   practice is "a scheme that seek[s] to exploit consumers."  *Republican Nat'l Comm. v.*

20   *Google LLC*, 742 F. Supp. 3d 1099, 1119 (C.D. Cal. 2024).  But Defendants improperly

21   conflate a scheme to exploit consumers with deception.  In support of their argument,

22   Defendants cite *Davis v. HSBC Bank*, 691 F.3d 1152 (9th Cir. 2012), but the plaintiff's

23   claims in *Davis* were expressly that the defendants "failed to disclose adequately the

24   existence" of a fee.  *Id.* at 1159.  That is not Plaintiff's claim here.  Other cases cited by

25   Defendants are inapplicable for similar reasons, as they simply address different

26   theories of why a practice is unfair.  *See, e.g.*, *Capito v. San Jose Healthcare Sys., LP*,

27   17 Cal. 5th 273 (2024) (discussing whether the failure to disclose emergency room

28   fees violated the UCL); *Sepanossian v. Nat. Ready Mix Co.*, 97 Cal. App. 5th 192 (2023)

1    (addressing claims that "energy" and "environmental" fees were misleading in

2    violation of the UCL when no other information was provided about the nature of the

3    fee).  Simply put, while deceitful and misleading practices can certainly constitute

4    conduct that creates liability under the UCL, that is not the only theory of liability that is

5    viable under the UCL.  There are numerous cases where courts have found unfair

6    prong UCL claims that did not involve deceitful practices to be viable.  *See, e.g.*, *Echo*

7    *and Rig Sacramento, LLC v. AmGuard Ins. Co.*, 698 F. Supp. 3d 1210 (E.D. Cal. 2023);

8    *King v. Bank of Am.*, No. 12-cv-04168-JCS, 2012 WL 4685993 (N.D. Cal. Oct. 1, 2012);

9    *In re Univ. of S. Cal. Tuition and Fees COVID-19 Refund Litig.*, No. 20-cv-04066-DMG,

10   2021 WL 3560783 (C.D. Cal. Aug. 6, 2021).  Thus, Defendants' argument that Plaintiff

11   must necessarily show that Defendants engaged in deceit is unpersuasive.[9]

12        Defendants also argue that finding the IVR fee unfair would mean that

13   numerous other fees would necessarily also be unfair.  (Defs.' Mot. at 33.)  But this is

14   not so.  The Court's determination here is based on the unique facts present in this

15   case and the specific balancing of those facts.  In no way does the Court's finding here

16   mean that "every other fee . . . [is] violative of the UCL."  (*Id.*)  Nor does it even mean

17   that charging any fee in connection with the Way2Go program itself is an unfair

18   business practice.  The Court only finds that under the specific facts before the Court,

19   the practice is unfair under the UCL.

20        **3.  Tethering Test**

21        Given that the balancing test is satisfied, the Court need not apply the tethering

22   test, and Plaintiff only argues that she succeeds under the balancing test.  *Lozano*, 504

23   F.3d at 735.  With that said, the Court notes that while Plaintiff does not argue for

24   application of the tethering test, Plaintiff does appear to have identified California

25   ───────────────

26   [9] Defendants also argue that the IVR fee cannot be unfair because DCSS is "responsible for the structure
     of the program" and authorized Defendants to charge the IVR fee. (Defs.' Mot. at 3.)  Plaintiff's claim is
     not that the structure of its system is unfair.  Certainly, as the Court addresses above, that system

27   enables the unfair business practice in question.  But it is Defendants' imposition of the IVR fee that
     Plaintiff challenges.  DCSS's authorization of the IVR fee is similarly irrelevant.  DCSS's approval of the

28   fee does not render the fee an inherently fair business practice or bar claims under the UCL.

1  state policies to which this practice is tethered.  Most significantly, Plaintiff identifies a

2  policy interest in ensuring that child support funds reach their recipients (*see* Pl.'s Mot.

3  at 21–23), which is likely to have a sufficiently close nexus to the challenged act,

4  though the Court makes no ruling on this point.  *See also Hodsdon v. Mars, Inc.*, 891

5  F.3d 857, 866 (9th Cir. 2018).  Regardless, Plaintiff's UCL claim is fully vindicated under

6  the balancing test.

7  **C. Unconscionability**

8          The Court has already determined that Plaintiff can challenge the fairness of the

9  IVR fee and also found that the IVR fee constitutes an unfair business practice.

10  Nevertheless, the Court pauses here to note that even if the specific factual bounds of

11  this case do not place it outside the general rule against courts considering the

12  fairness of contract terms, Plaintiff's challenge to the fairness of the IVR fee is still

13  permissible based on the unconscionability of that term.

14          In Footnote 6, the *Samura* court contemplated that unconscionable contract

15  terms could still constitute an unfair business practice.  17 Cal. App. 4th at 1299 n.6.

16  ("a practice of enforcing the third party liability provisions with disregard for

17  considerations of unconscionability might constitute an unfair business practice in

18  violation of the unfairness term of Business and Professions Code section 17200.")

19  Other courts have continued to recognize that the insertion of an unconscionable

20  term into a contract may constitute an unfair business practice.  *See Brecher v.*

21  *Citigroup Glob. Markets, Inc.*, No. 09-cv-01344-CAB-MDD, 2013 WL 12205124, at *4

22  (S.D. Cal. Mar. 27, 2013) ("Because an unconscionable term can be an unfair business

23  practice, Defendants' alleged misconduct is actionable under California's UCL.").  In

24  their Reply, Defendants recognize that the unconscionability of the IVR fee could

25  provide a basis for a claim under the UCL.  (Defs.' Reply at 4.)  While Defendants assert

26  that "Plaintiff has not made that claim here[,]" (*id.*), whether the IVR fee provision in the

27  Terms of Use is unconscionable appears to be at the spiritual core of Plaintiff's claim.

28  (*See* Pl.'s Mot. at 10 ("The question in this case is whether it is substantially injurious to

1  consumers, unethical, <u>unconscionable, or oppressive</u> for Defendants to convert

2  money intended to support the health and well-being of children into a corporate

3  profit center." (emphasis added)); *see also* Pl.'s Reply at 6 (addressing

4  unconscionability and citing Footnote 6 of *Samura*).)

5        In California, to establish a contract term is unconscionable, the plaintiff must

6  show that the provision was both procedurally and substantively unconscionable.

7  *Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal. 4th 83, 114 (2000).  These

8  elements are assessed on a "sliding scale" where a lesser showing of procedural or

9  substantive unconscionability is required where there is strong evidence of the other

10  unconscionability element.  *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th

11  Cir. 2006).  The procedural element focuses on whether there was "'oppression' or

12  'surprise' due to unequal bargaining power[.]"  *Armendariz*, 24 Cal. 4th at 114.  Where

13  the contract is a contract of adhesion, this element is often but not necessarily

14  satisfied.  *Nagrampa*, 469 F.3d at 1281 ("The California Court of Appeal has held that

15  a finding of a contract of adhesion is essentially a finding of procedural

16  unconscionability." (cleaned up)).  Thus, the threshold inquiry is whether the contract

17  in question is a contract of adhesion.  *Id*.

18        As discussed above, the Terms of Use are plainly a contract of adhesion and a

19  particularly oppressive contract of adhesion at that.  *See* Cross-Motions for Summary

20  Judgment II.B.1–2.  Moreover, from the discussion above, it is apparent that the

21  contract and the IVR fee term it contains were procedurally unconscionable.

22        The substantive unconscionability element focuses on whether the results of

23  that provision were "one-sided" or "overly harsh" to one side.  *Id*.  "A 'lack of mutuality'

24  is relevant in analyzing this prong."  *Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1043

25  (9th Cir. 2001) (citing *Armendariz*, 24 Cal. 4th at 117).  Given the strong evidence of

26  procedural unconscionability, a lesser showing on substantive unconscionability is

27  required.  *Nagrampa*, 469 F.3d at 1281.  But even under a higher burden, it seems

28  readily apparent that the IVR fee is also substantively unconscionable.

The IVR fee is substantively unconscionable for many of the same reasons the Court determined above that the IVR fee is unfair. As discussed, the IVR fee is included in an oppressive contract of adhesion imposed on child support recipients who have little choice but to accept these terms if they wish to receive funds via a prepaid debit card. While the amount of a single charge is low – only 50 cents – and occurs only after the three free calls in a month have been used, the undisputed facts are that in a five-year period these charges resulted in eight million dollars in fees being charged to just over 175,000 users. This is money taken directly from funds intended to provide support for children.

By contrast, the IVR fee provides substantial benefit to Conduent. By their own accounting, the IVR fee provides Conduent with an additional revenue stream from the Way2Go program, more than offsetting many of the costs reasonably associated with providing the IVR line. This is despite the fact that the IVR line saves Conduent money by providing customers with an IVR line as opposed to a live agent, for which Conduent does not charge a fee. Thus, Conduent is taking fees from child support funds intended for Class Members who are seeking customer support assistance using an IVR system that reduces Conduent's overhead.

Under these facts, the IVR fee within the Terms of Use is definitively one-sided. Even without consideration of the lesser burden given the clear procedural unconscionability of the term, it is clear that the IVR fee has a distinct lack of mutuality. It is thus substantively unconscionable given the procedural unconscionability under which the contract term was created.

Having determined that the IVR fee satisfies both the procedural and substantive unconscionability elements, the Court finds that this provision is unconscionable under California law. Thus, it is also permissible for Plaintiff to challenge this contract term under the unfair prong of the UCL on this basis as well.

### D. Defendant Comerica

Defendants move for summary judgment as to Defendant Comerica based mainly on the grounds that Plaintiff "took no discovery from Comerica" besides a single interrogatory. (Defs.' Mot. at 6-7.) This is not a basis for summary judgment. That said, later briefing clarified that Defendants' position was that Comerica "had no involvement with the fee" and that there was no evidence that "Comerica negotiated the customer service fee, assesses the fee, receives any portion of the fee, or has any responsibility for the customer service function." (Defs.' Reply at 7.) This argument is unpersuasive largely because the Terms of Use – on which Defendants heavily rely in their own Motion for Summary Judgment and Opposition to Summary Judgment – is Comerica's Terms of Use, not Conduent's. (*See* ECF No. 95-6.) Thus, it is based on Comerica's inclusion of this term in their Terms of Use that Plaintiff and Class Members are subject to the IVR fee in the first place. Defendants assert that "[t]he contract at issue is between Conduent and DCSS, and the obligations under the contract are Conduent's." (*Id.*) But Plaintiff and Class Members are not a party to that contract, and the business practice that they challenge as unfair is the charging of the IVR fee – a practice that is imposed on Class Members through a provision in Comerica's Terms of Use.

Defendants' central contention appears to be that the inclusion of this term is solely for Conduent's benefit and that Comerica gains no benefit from it, but Defendants cite no cases that stand for the proposition that Comerica should be free from any liability for including that provision in their Terms of Use simply because it is Conduent that ultimately profits from that fee being charged. This fact may certainly be relevant to the determination of the party responsible for payment of restitution damages. But Plaintiff notably also seeks injunctive relief to prevent Defendants from continuing to charge the IVR fee. Defendant Comerica, as the party imposing that term on Class Members, is an appropriate target for such relief. Thus, summary judgment is denied as to the arguments related to Defendant Comerica specifically.

**III. Relief**

Remedies under the UCL are limited.  Generally, only two forms of relief are available to plaintiffs: restitution and injunctive relief.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).  Plaintiff seeks both restitution and injunctive relief.  Defendants argue that neither form of relief is appropriate.

Defendants' argument against awarding restitution is that before filing this lawsuit, Conduent refunded Plaintiff $1.00 for the fees she paid for calls in June.  But in response, Plaintiff notes that Conduent's records show that she was actually charged the IVR fee six times between 2021 and 2023.  (*See* Pl.'s Mot. at 18; Ex. 51 (ECF No. 108-13).)  Defendants did not respond to this argument or present any contrary argument.

Restitution is appropriate in this case.  Plaintiff and Class Members were subject to numerous charged IVR fees during the class period and, as determined above, this was an unfair business practice.  The return of the fees Defendants collected from Plaintiff and Class Members because of this unfair business practice is appropriate. The Court has broad discretion in determining the appropriate restitution "as long as it is supported by the evidence and is consistent with the purpose of restoring to the plaintiff the amount that the defendant wrongfully acquired."  *Compart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 998 (E.D. Cal. 2018) (internation citations and quotations omitted) (citing *Astiana v. Kashi Co.*, 291 F.R.D. 493, 506 (S.D. Cal. 2013)).

There is some inconsistency between the parties as to the exact amount of IVR fees that Defendant Conduent collected during this period.  In his Second Supplemental Report, Plaintiff's Expert Jonathan Jaffe calculated that Defendant Conduent had collected Class Members $7,789,835.00 in IVR fees from July 20, 2020, to February 21, 2025.  (*See* ECF No. 73-21 ¶¶ 29, 38, 47.)  Defendants concede that Conduent charged Way2Go users $7,619,059.00 between 2020 and 2024, though they assert that this amount is only what was charged, not necessarily what was

1    collected.  (JSUF ¶ 9; DSUF ¶ 23 (stating that Conduent "charged but did not

2    necessarily collect" this amount in IVR fees).)

3         Defendants do not substantively challenge Jaffe's calculation of the IVR fees

4    that Defendants collected.[10]  Defendants have also not presented any contrary

5    evidence or accounting that contests the validity of Jaffe's accounting of how much

6    Defendants collected from IVR fees.  Jaffe's calculations have the advantage of

7    covering the entire class period.  They also only consider the amount actually debited,

8    not charges that may or may not have been actually collected.  This is confirmed by

9    Conduent's corporate designee, Dolly Sheth, who testified that the transaction

10   information provided by Conduent showed amounts actually debited from the

11   account, not what was only charged, including accounting for partial charges where

12   insufficient funds were available to cover the full 50-cent IVR fee.  (*See* ECF No. 73-19

13   at 96–5:97–7.)  The Court thus finds that restitution of $7,789,835.00 paid to Plaintiff

14   and Class Members will restore them to the amount wrongfully acquired and that this

15   amount is supported by the evidence.  *Compart, Inc.*, 339 F. Supp. 3d at 998 (citing

16   *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938–939 (9th Cir. 1999)).

17        Injunctive relief is also appropriate to prevent the future harm of further IVR fees

18   being charged.  Defendants' argument that there is no risk of irreparable harm

19   because the IVR fee is disclosed is not persuasive; the IVR fee is an unfair business

20   practice, not because the fee was not disclosed, but due to the fact that it was

21   imposed via a particularly oppressive contract of adhesion and inflicts a harm that

22   greatly outweighs the utility of the fee.  Defendants' other argument that injunctive

23   relief is not appropriate because "Plaintiff, through her pursuit of money damages, has

24   demonstrated that she has an adequate remedy at law[,]" is not legally sound.  (Defs.'

25   ────────────────

26   [10] As discussed above, Defendants contest many of Jaffe's findings.  *Supra* Evidentiary Motions, II.
     However, Defendants' only complaints with Jaffe's calculation of the IVR fees Defendants collected

27   were that Jaffe originally improperly included 19 days that predated the Way2Go program and the
     timeliness of the Second Supplemental Report, which resolved the former issue.  These issues are
     addressed in detail above.  Defendants did not raise any other issues with Jaffe's calculation of the

28   collected IVR fees.

1 Mot. at 35.)  The monetary relief Plaintiff seeks is restitution under the UCL, a form of

2 equitable relief.  *See Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1312 (9th Cir. 2022)

3 (identifying that UCL provides for "equitable restitution" to plaintiffs).  The fact that

4 Plaintiffs may receive restitution under the UCL does not render them unable to also

5 obtain injunctive relief.  Restitution is intended to provide relief for the past harm,

6 while injunctive relief prevents future harm; these are not mutually exclusive.  *See*

7 *Troyk v. Farmers Grp., Inc.*, 171 Cal. Appl. 4th 1305, 1339 (2009) ("Through the UCL a

8 plaintiff may obtain restitution <u>and/or</u> injunctive relief . . . ." (emphasis added) (internal

9 citations and quotations omitted)).  Injunctive relief is appropriate here to prevent

10 further IVR fees from being charged.

11        The Court emphasizes that this relief is awarded based on the particular set of

12 facts before the Court.  Contrary to Defendants' arguments otherwise (Defs.' Mot. at

13 33–34), nothing in the Court's Order should be read to imply that other fees

14 necessarily also violate the UCL.  As discussed above, it is only because of the specific

15 facts here – fees taken from child support payments via a contract of adhesion to fund

16 an automated line, a system which saved Defendants money and was required by a

17 contract through which Defendants received compensation – that the Court finds a

18 violation of the UCL, and that injunctive relief is warranted and appropriate under

19 section 17203 of the UCL.

20                              **CONCLUSION**

21      For the reasons stated above, IT IS HEREBY ORDERED that:

22        1. Plaintiff's Motion for Summary Judgment (ECF No. 69) is GRANTED;

23        2. Plaintiff, on behalf of the class, is awarded $7,619,059.00 in restitution for

24           IVR fees charged to Class Members between July 20, 2020 and February

25           21, 2025.

26        3. The parties are ordered to meet and confer regarding a proposed

27           process for allotment and distribution of the restitution to class

28           members.  The parties are ordered to file a stipulated proposed order to

enact that distribution on or before January 6, 2026. If the parties cannot reach an agreement regarding the distribution process, Plaintiff may file a proposed order by that date and Defendants may file objections to the proposed order on or before January 13, 2026.

4. Defendants are hereby enjoined from collecting IVR fees from California recipients of child support under the Terms of Use currently imposed by the Way2Go card.

5. Defendants' Motion for Summary Judgment (ECF No. 93) is DENIED;

6. Defendants' Motion to Exclude the Testimony of Jonathan Jaffe (ECF No. 88) is DENIED;

7. Plaintiff's Motion to Strike the Expert Report of Carl Pry (ECF No. 66) is DENIED AS MOOT;

8. Plaintiff's Motion to Exclude Late Disclosed Information or Reopen Discovery (ECF No. 118) is DENIED;

9. The pretrial conference and trial dates (ECF No. 127) are VACATED.

IT IS SO ORDERED.

Dated:   **December 8, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

32